Brumley-Donaldson Company v. Commissioner.
Brumley-Donaldson Co. v. Commissioner
Docket No. 5813-66.
United States Tax Court
T.C. Memo 1969-183; 1969 Tax Ct. Memo LEXIS 112; 28 T.C.M. (CCH) 912; T.C.M. (RIA) 69183; September 8, 1969, Filed Earl C. Crouter, 606 S. Olive, Los Angeles, Calif., for the petitioner. Stephen W. Simpson, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined a deficiency of $4,172.36 with respect to petitioner's income taxes for the taxable year ended June 30, 1960. Petitioner not only contests this deficiency but seeks an overpayment of income tax for its taxable year 1960 in the amount of $26,792.10. The total amount in controversy is thus $30,964.46. The sole issue for decision is whether petitioner was entitled in its taxable year *113 1960 to a net operating loss deduction of $59,547.03. The deduction resulted from the carryover of net operating losses incurred by a corporation which petitioner acquired in 1959. Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioner is a corporation organized under the laws of the State of California. Its principal office has been in Huntington Park, California. Petitioner filed its income tax return for the taxable year ending June 30, 1960, according to an accrual method of accounting with the district director of internal revenue, Los Angeles, California. Petitioner was organized on or about September 20, 1946, for the purpose of engaging in the business of manufacturing, importing, and distributing industrial materials, including the selling of firebricks of various grades, sizes, and quality. St. Louis Fire Brick & Insulation Company (hereinafter referred to only as St. Louis) was a California corporation organized on or about January 5, 1926. It was engaged in the business of manufacturing and selling firebricks of second-quality. The property *114 of St. Louis was adjacent to that of petitioner. In fact, they shared the same mailing address. Prior to its acquisition of the capital stock of St. Louis on December 23, 1959, petitioner had not manufactured the firebrick which it distributed. Petitioner obtained its bricks from two sources. It bought firstquality bricks from North American Refractories of St. Louis, Missouri. It obtained second-quality bricks from St. Louis. First-quality firebrick is useful in constructing those portions of a furnace where extremely high temperatures are encountered. Second-quality brick is used in constructing those portions of the furnace where temperatures are not high. The need for second-quality brick has been steadily declining. This decrease in demand began in the late 1920's along with technological changes in the industries which consumed firebrick. The decline in market became particularly acute in 1955. By 1959, only St. Louis and one other company, Gladding McBean, were producing second-quality firebrick for the 913 Los Angeles area. At the date of trial, after discontinuance by petitioner of its production of second-quality firebrick, only Gladding McBean Company was producing *115 second-quality firebrick for the Los Angeles area. By September 1960 second-quality firebrick had become only a complementary item to round out the inventory of a general foundry supply business. As of 1952, St. Louis was incurring net operating losses. At the date of petitioner's acquisition of St. Louis the latter had accumulated net operating losses of $59,547.03. Its books and records further disclose: Year
Sales
Income (orLoss)
Remarks
1955
$56,197.45
( $48,529.37)
1956
28,020.00
16,819.77
This income was offset by net operating loss carryovers from 1952 and 1953.
1957
24,094.51
(14,741.50)
1958
22,959.06
0
Capital gain offset by net operating loss.
1959
30,508.22
(9,135.16)
As noted from the table above, the gross sales of St. Louis decreased by almost 50 percent between 1955 and 1959. After December 23, 1959, gross sales continued their steady decline. For the last reported period, June 30, 1962, to June 30, 1963, gross sales were $6,517. On February 12, 1963, a fire occurred in the manufacturing plant and production of bricks was discontinued. At the time petitioner acquired St. Louis the company, including Alois J. Mesmer *116 (hereinafter referred to only as Mesmer), its sole shareholder and president, had five employees. As of October 31, 1959, the balance sheet showed St. Louis had total assets of $24,817.51, with $24,222.71 of such assets being current. The land which St. Louis occupied was owned by Mesmer and so was not an asset of St. Louis. Of the current assets, 23.7 percent were represented by an amount due from an officer. Fixed assets amounted to $542.80. Out of an original cost of $24,858 for machinery, office furniture, and delivery equipment, accumulated depreciation amounted to $24,315, leaving $543 worth of fixed assets to be depreciated. St. Louis was due $1,972 in trade accounts receivable while it owed $1,194 in trade accounts payable. There was a deficit in retained earnings of $111,503 as of October 31, 1959. Prior to petitioner's acquisition of St. Louis, its officers conferred with the auditors of St. Louis. Mesmer had requested them to do so. In July or August of 1959 the officers learned from the auditors about the operating losses of St. Louis. After negotiations, it was agreed that petitioner would receive all of the outstanding stock of St. Louis from Mesmer for 6,577 shares *117 of petitioner's stock, each share of petitioner's stock to be valued at $3.05. It was agreed that Mesmer would become assistant to the president of petitioner at $1,000 per month. On December 23, 1959, petitioner acquired all of the capital stock of St. Louis from Mesmer. The capital stock consisted of 117 2/3 shares of preferred stock and 1,731 shares of common stock. Mesmer received in exchange 6,577 shares of petitioner's common stock. Immediately after such exchange of stock, petitioner had outstanding a total of 268,557 shares of capital stock. All of petitioner's stock was common stock with voting rights. On December 28, 1959, petitioner liquidated St. Louis. Petitioner took over all the assets and assumed all the liabilities of St. Louis. Prior to petitioner's discontinuing the operations of its St. Louis division, only during one accounting period, December 1959 through June 1960, did St. Louis earn a profit. However, this profit of $1,576 did not have charged against it St. Louis' pro rata share of administrative expenses. During the next accounting period, July 1960 through June 1961, St. Louis incurred a loss of $1,109. This loss likewise did not include St. Louis' *118 pro rata share of administrative expenses. Petitioner had certain of its employees make studies concerning the St. Louis division. The purpose of the studies was to demonstrate to management that reduction in manufacturing costs would allow for a reduction in selling price, thereby increasing overall gross sales. In order to accomplish the desired result, the studies recommended capital expenditures of no more than $10,000 to (1) construct a new kiln and (2) repair and revamp the grinding, material handling, and pressing equipment. A new kiln was never constructed. Petitioner also did not carry out the second recommendation. The 914 manufacturing building and the drying buildings, all of which St. Louis used in producing its bricks, were insured for a total of only $5,000. As of December 23, 1959, St. Louis had net operating loss carryovers of $59,547.03. For the taxable year ending June 30, 1960, petitioner had taxable income, before its claim for a net operating loss deduction, of $334,841.60. Opinion The sole issue presented is whether petitioner is entitled to carry over the net operating losses of St. Louis, whose stock petitioner acquired during its taxable year 1960. *119 Respondent focuses his primary attack on the language of section 269. [1] He urges that the principal purpose for petitioner's acquisition of St. Louis was avoidance of Federal income tax by the use of St. Louis' net operating loss carry-forwards. Petitioner's only argument with respect to section 269 relates to what was its principal purpose at the time of the acquisition. *120 It is stated in the legislative history of section 269, as originally enacted in 1943, that "the section should be operative only if the evasion or avoidance purpose outranks, or exceeds in importance, any other one purpose." S. Rept. No. 627, 78th Cong., 1st Sess. (1944), 1944 C.B. 973, 1017. The evidence presented in the immediate case supports the conclusion that such avoidance exceeded in importance any other one purpose which petitioner had in acquiring St. Louis. We have taken cognizance of the following facts. The sole product of St. Louis was second-quality firebrick. Demand for such brick had been steadily declining for decades. The decline in demand became particularly acute as of 1955. With such decreased demand it was inevitable that the operations of St. Louis would become unprofitable. This had occurred as early as 1952. Between 1955 and 1959 its sales dropped from about $56,000 to approximately $30,500. During this interval only in 1956 did St. Louis have an operating profit. Thus, we have concluded that petitioner's acquisition of St. Louis was not necessary or even useful to petitioner's operations. Moreover, because of the steady decline in demand *121 for St. Louis' sole product it was improbable that petitioner would continue to operate St. Louis as a division. We have also taken cognizance of the fact that officers of petitioner had engaged in discussions with the auditors of St. Louis prior to the date of the acquisition. Through these meetings petitioner's officers were aware of the net operating losses of St. Louis. In order to prove that tax avoidance was not its principal motive, petitioner has advanced three business purposes for its acquisition of St. Louis. These reasons will be examined. Petitioner's president testified that by acquiring St. Louis petitioner felt it could increase its overall foundry business. No evidence was submitted, however, showing in what manner petitioner intended to achieve this result. It is true that petitioner caused studies to be made with respect to increasing the sales of second-quality firebrick. These studies recommended the construction of a new kiln and, if possible, although not absolutely necessary, the repair of the machinery then being used. The construction of a new kiln was never accomplished. From the fact that the insurance on both the manufacturing building and the drying *122 buildings combined was only $5,000, it can be assumed that the equipment was not extensively renovated. It follows that petitioner itself was not willing to risk much capital to improve the business it had acquired. As for a second purpose of the acquisition, the president of petitioner testified that petitioner needed for expansion the property occupied by St. Louis. This alleged purpose is not consistent with the fact that Mesmer, the president of St. Louis, rather than St. Louis itself, owned the land. 915 Petitioner has introduced no evidence showing that Mesmer would have been unwilling to sell his land unless he also sold his stock in St. Louis. As for petitioner's third purpose, its president testified that petitioner wanted to acquire the services of Mesmer. Considering how unsuccessful Mesmer had been as president of St. Louis, we do not give much weight to this alleged purpose. Certainly the record falls far short of carrying petitioner's burden of proving that tax avoidance was not the primary purpose for the acquisition. In view of the foregoing we hold that the Commissioner correctly disallowed under section 269 petitioner's deduction of its net operating loss *123 carryover. Since we have so held, we need not discuss respondent's contentions with respect to section 382(b). Petitioner has not argued to the contrary. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954 unless otherwise indicated. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - * * * (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. * * *↩